## BRYANT v. STOHN.

### No. 14622.

Court of Civil Appeals of Texas. Dallas.
June 5, 1953.

Rehearing Denied July 3, 1953.

C. C. Renfro, Dallas, for appellant.

Herbert Marshall, Dallas, for appellee.

YOUNG, Justice.

The suit was brought under art. 4004, Vernon's Ann.Civ.St., providing for damages resultant upon fraudulent land sales. The subject matter was oil royalty acreage lying in Coke County; the purchase being allegedly based on material misrepresentations made by appellant Bryant. On trial and answers to special issues, plaintiff Stohn recovered judgment for $25,001.20 actual and $5,000 exemplary damages, from which court action this appeal is prosecuted.

The locale was in north part of Coke County, the territory known as unproven or "wildcat"; at least until about June 4, 1948 when Lassiter Well No. I, in SW corner of SE quarter, Section 308, was completed as a producing oil well. The royalty in question lay under a spread of more than 2,000 acres and the transaction represented a purchase of 280 royalty acres; plaintiff having alleged in the action brought that this royalty was worthless and that he should have judgment for $67,000, the entire purchase price, and in addition $10,000 as exemplary damages.

Gist of the alleged misrepresentations is reflected in jury issues and answers; in substance that: (1, Issue 1) On or about June 4, 1948 defendant represented to Stohn that he, Bryant, "had a friend named Bill Davidson who had placed the recoverable value on the oil located under the land proposed to be purchased * * * of 15,000 barrels of oil per acre"; which representation was made with intent on part of Bryant to induce plaintiff to purchase the royalty; was believed in and relied upon by plaintiff, who was thereby induced to pay $67,000 for said royalty. (2, Issue 6) Defendant Bryant had represented to plaintiff on or about June 4, 1948 that the royalty involved herein was selling for $200 to $225 per acre; which statement was false and made by defendant with intention to induce plaintiff to purchase the royalty; that plaintiff believed in and relied upon such representation, being thereby induced to pay $67,000 for such royalty acreage. (3) That defendant Bryant represented the value of the royalty in suit on June 4, 1948 to be $239.29 per acre. (4) That the reasonable cash market value of the royalty in question on June 4, 1948 in Coke County was $150 per acre (the difference between $239.29 and $150—$89.-29—multiplied by 280 acres, amounts to $25,001.20 fixed as actual damages); with exemplary damages assessed by the jury in the sum of $5,000.

Defendant's points of appeal may also be summarized, viz.: (1) Error in overruling his motion for instructed verdict; the evidence showing that the representations made to plaintiff with respect to royalty acreage purchased were based wholly on information furnished by other persons "and when repeated or made by Bryant to plaintiff were disclosed to be such and constituted mere expressions of opinion on his part," and therefore not such fraud as would support a recovery of damages; (2) the court's judgment was erroneous because of no jury finding amounting to misrepresentation of a material fact such as is required under art. 4004 to support a claim of actionable fraud; (3) jury answer to issue No. 6 that Bryant represented to plaintiff that the particular royalty was selling for $200 to $225 per acre on June 4, 1948 was insufficient to support a recovery in the sum of $25,001.20; likewise insufficiently supported by the evidence was jury finding No. 9 that plaintiff believed and relied on defendant's representation that the royalty was selling for $200 to $225 per acre; (4) submission of Issue No. 11 whereby the jury was directed to find what amount per acre defendant had represented the royalty values to be was error, because of no evidence in support; there being further error in submission of Issue 12, wherein the jury was instructed to determine the reasonable cash market value per acre of the royalty on June 4, 1948, when the measure of damages under art. 4004 was the difference be-

tween the value of the property based upon its condition and character as represented, and its actual value on date of sale in the condition as delivered; (5) error in the rendition because of no evidence as to the difference between value of the royalty as it was represented by defendant and its actual worth in the condition it was when conveyed to plaintiff; (6) error in submission of issue on exemplary damages; the evidence disclosing that the misrepresentations, if any, on part of defendant were not willfully made; all statements complained of being "upon information obtained while he was trying to find out all he could about a royalty purchase for appellee and which representations, if made, were not of the character made liable for exemplary damages under the terms of Article 4004."

Plaintiff C. F. Stohn, a resident of Plattsburg, New York, lived in Dallas for two years—1946 to 1948; engaging in several oil ventures. Here also Stohn became acquainted with defendant Bryant, resulting in a rather close friendship socially, as he testified; and for background of the instant suit, plaintiff alleged with testimony in support that: "As the weeks and months went by, defendant Bryant told the plaintiff that he, Bryant, was in the oil business and that he was expecting to receive some very confidential information from a friend that would enable him to buy up some good oil property at a very reasonable figure so as to be able to realize a very substantial profit from his investment. Defendant Bryant represented to the plaintiff that when he received such information he would bring it to the plaintiff and if the plaintiff would put up the money and advance the purchase price of the properties, which the defendant expected to be able to locate, that the defendant Bryant would bring said information to the plaintiff with the understanding that any oil and gas leases or royalty or minerals purchased as a result of the information advanced by the defendant Bryant to the plaintiff that the defendant Bryant would receive as his remuneration or pay for the furnishing of the valuable information a ½ interest in any oil and gas leases or royalties or

minerals that were bought by the plaintiff. Defendant Bryant represented to the plaintiff that he had a very good friend who was engaged in the business of drilling tests for major oil companies to determine where the various oil bearing formations were located, that these tests could be drilled very cheaply and quickly and that the defendant, through his friendship with the manager of a core laboratory company, hereinafter referred to as the laboratory company, would obtain valuable information far in advance of the general public's securing the information."

The "friend" referred to in above pleading, also in Issue No. 1, as Bill Davidson, was President of Core Laboratory Company, a concern engaged in analysis of the varying structures encountered in drilling for oil, gas, or other minerals. This Company had kept a "log" on the Lassiter Well No. I, drilled in on June 4, as already stated; the Schlumberger test, as hereinafter referred to, being an electrical device made use of for the same purpose, i. e., a record of ground structures or formations as indicative of oil, gas, or water.

Two specific findings of false representations (Issues 1 and 6) are the basis of judgment: (1) That Bill Davidson had written "15,000 barrels per acre" of recoverable oil on a Schlumberger report of the Lassiter No. I Well, just completed; and (2) that the royalty involved was selling at from $200 to $250 per acre. Relative thereto, plaintiff testified to the following occurrence of June 4, 1948: About 7:00 o'clock in the evening defendant came to his apartment, saying: "'This is it. This is it,' and I said, 'What is it?' and he said, '* * * This is the deal that we have been talking about.' So he came in and he was excited, and he took a map of the territory, the county there, out of his pocket.

"Q. What county? A. Coke. And spread it out on the floor and got down on his hands and knees and invited me down with him, which I did, and he was pointing out this place on the map where this well was just being completed. The Number 1 well. Then he showed all of the territory around near it, and he was saying

what a wonderful buy it would be if we could get this royalty in that spot. That this well was going to come and was going to be at least a five thousand barrel well. * * *

"Q. Did he have any other papers with him? A. Yes, he showed us a Schlumberger (report) of that well. * * *

"Q. That Schlumberger, did that have any writing on it at that time? A. Yes. I can't read a Schlumberger. I couldn't even now. But on the top of it was written in, in ink, '15,000 barrels per acre'. So I asked Bryant at the time, I said, 'Whose writing is that?' and he said, 'That is Bill Davidson's writing. I have been with him all afternoon. I have just left his place,' and then there was also a parenthesis there in pencil, and he said, 'This here, they have got eighty feet of Strawn sand or lime in this, and that isn't even included in this fifteen thousand estimate.'

"Q. After this conversation did you discuss the question of purchasing royalties? A. Yes. I mean everything was going along quite fast like, and so he said, 'I want to put through a telephone call,' so he put in a call to Bill Barbre in the hotel in San Angelo, and when he got him on the phone, he asked me to come over and listen in, which I did. I put my head next to his and listened in on the conversation. And so, he told Mr. Barbre who he was and asked if he had any royalty for sale around that particular Lassiter well, and Barbre replied yes, that he had. Bryant asked him, 'Do you suppose I can get any,' and he said, 'Yes, I think I have got some,' so he said, 'Just a minute,' or something like that, and so he read off what he had. It amounted to 240 acres and the total price was to come up to $58,000. Barbre mentioned over the phone that he had to pay * . * * $200 and $225 per acre, and that he wanted $25 per acre for himself, namely, making the price to me $225 and $250 per acre. * * *

"Q. (By Mr. Marshall) Did you discuss the question as to the value of the royalties? A. Yes, I did. At the time when I found out it was $58,000. I mentioned to Bryant. I stated to Bryant,

'Well, that's an awful lot of money,' and I said, 'When we first entered into this talk of buying royalties, I understood it was going to be an awful lot less.' And he said, 'You don't have to worry.' He said, 'It takes money to make money.' And he said, 'This profit,' he says, 'you can't lose.' He says, 'There is no gamble in it.' He says, 'It is a sure thing.' And he says, 'The more money you spend, the more you are going to make.'

"Q. Did he make any representations to you as to what that royalty was worth? A. Yes, he told me it was cheap at that price that I would have to pay for it.

"Q. What price? A. Approximately $250 an acre. He said it was very cheap at that price. And he told me that within three days time after the well came in that I would be able to sell part of my holdings and recover all of my money back and have some royalty left over."

In a second phone conversation the same evening, forty additional acres were added to the purchase at $9,000, making 280 acres as the royalty bought for $67,000 in cash. The deal was closed the next morning at a local bank, Stohn learning in the meantime that Barbre did not hold title to the acreage; that Sharp and Litchlighter were the owners who signed the deeds to Bryant; the latter then conveying to Stohn a one-half interest; sellers also paying to Bryant $1,000 cash as commission on the deal.

The royalty involved is an interest in land. Material here, art. 4004, V.A.C.S., provides: "Actionable fraud in this State with regard to transactions in real estate * * * shall consist of * * * a false representation of a past or existing material fact, * * * which is made as a material inducement to another party to enter into a contract * * *. All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented * * * and the actual value of the property in the condition it is delivered at the time of the contract. All persons making the false representa-

tions or promises and all persons deriving the benefit of said fraud, shall be jointly and severally liable in actual damages, and in addition thereto, all persons wilfully making such false representations or promises or knowingly taking the advantage of said fraud shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered."

By the enactment of art. 4004 in 1919, the rule of damages has been changed in cases of land fraud, being now fixed as "the difference between the value of the property as represented * * * and the actual value of the property in the condition it is delivered at the time of the contract." And here it will be noted that jury Issue No. 1 (finding that defendant represented to plaintiff that one Davidson had placed a recoverable value of 15,000 barrels of oil per acre under the land proposed to be purchased) does not follow through with an issue concerning value of the royalty purchased had it been *as represented*, i. e., bearing the Davidson appraisal with reference to amount of recoverable oil; in the same connection, appellant admitting that Issue No. 1 and affirmative answer thereto constituted a material representation within terms of art. 4004. Here the materiality of aforesaid finding, absent the further issue required by statute of the royalty value had it been as represented, may well be questioned; and as to this, reference will be made hereinafter.

■■ We now turn to appellee's second primary finding of false representation and reflected by Issue No. 6, the answer thereto being that defendant had represented the royalty involved as selling on June 4, 1948 for $200 to $225 per acre. The finding is challenged, (1) as not a representation made by defendant at all, but was information furnished to both parties in the telephone conversation already quoted; and (2) even if made, same did not amount to a misrepresentation within meaning of art. 4004. The long distance communication with Barbre, initiated by defendant, was testified to by plaintiff, viz.: "Barbre

mentioned over the phone that he had to pay $200 and $225 per acre, and that he wanted $25 per acre for himself, namely, making the price to me $225 and $250 per acre." Barbre, on the stand, did· not remember making the statement just quoted of what the royalty cost him; denied telling anybody that he would sell for $25 profit per acre; stating that he had paid anywhere from $50 to $200 per acre for "that royalty play I made in there."

We find no record testimony anywise in support of jury finding No. 6 (representation by Bryant to Stohn that on or about June 4, 1948 the royalty in question was selling for $200 to $225 per acre), except as reflected in the foregoing paragraph. If the statement of Barbre on said date that the involved royalty had *cost* him from $200· to $225 per acre be considered the equivalent of a representation concerning the *selling* price per acre, the same was a misrepresentation on part of Barbre. This is so because the cost to Barbre was not $200 to $225 per acre (basis of sales price) as we have already seen. And defendant, having availed himself of the Barbre misrepresentation in his transaction with plaintiff, thereby made it his own. "If one refers to another on any subject, it is a general rule of evidence that he is bound by what that person says on the subject, the same as if he had said it himself. Hence if one party to a transaction refers the other to a third person for information, the party making the reference is liable for false and fraudulent representations made by the person to whom he refers." King v. Shawver, Tex.Civ.App., 30 S.W.2d 930, 932, quoting from 12 R.C.L p. 403; 23 Am.Jur. p. 1013; 37 C.J.S., Fraud, § 61, pp. 347, 348.

■■ Again, considering the testimony of the witness Barbre as sufficient basis for submission of Issue 6, actionable fraud is involved in the affirmative answer thereto under the facts and circumstances of this case; the fraud implicit therein being that the acreage was represented as costing Barbre $200 to $225 per acre, on which an advance of $25 per acre respectively was figured as the selling price. "It is generally held that where the cost price is

the basis for fixing the selling price or amount to be paid, a false statement as to such cost price constitutes, when justly relied upon, fraud which entitles the injured party to relief." Annotations 66 A.L.R. p. 193. While we find no express approval by our own Courts of the rule just stated, the following cases are closely analogous: Hall v. Grayson County National Bank, 36 Tex.Civ.App. 317, 81 S.W. 762, holding that a misrepresentation of the selling price of oil land was concerning a material fact, was fraudulent and actionable; Price v. D'Yarmett, Tex.Civ.App., 27 S. W.2d 616, holding that under the evidence, defendant knew of the falsity respecting costs of property exchanged amounting to actionable and intentional fraud. See also 23 Am.Jur. 835; Pomeroy, Equity Jurisprudence, 5th Ed., Vol. 3, pp. 457, 458. And that plaintiff believed and relied on such representations is shown by direct testimony, viz.: "I was relying on what James McKinley Bryant told me, because I trusted the man implicitly, and I was relying on him * * *."

█ Thus far we have dealt with the primary issues of misrepresentation as raised in both pleadings and evidence. The damages, if any, resulting therefrom must be determined by legislative formula, art. 4004, in which connection a substantial compliance with the statute is required. Payton v. City of Big Spring, Tex.Civ. App., 157 S.W.2d 975. "In order for a party to recover the measure of damages provided by the above statute [Art. 4004], it is essential that he allege and prove the value of the property received, if it had been as represented, and its actual value in the condition in which it was delivered at the time of the contract, the difference between such value constituting the measure of damages." Bryant v. Vaughn, Tex., 33 S.W.2d 729, 730. Obviously in the case at bar there was no such submission of corollary issues on measure of damages as is contemplated by the statute, following Issue 1 (value based on Davidson's appraisal), and Issue 6 (value if the acreage had in fact cost Barbre $200 to $225 per acre); and it matters not if the jury might conceivably have arrived at the same result under the instant manner of presentation.

█ Nor, in our opinion, are the deficiencies just referred to healed by Issue No. 11, reading, "From a preponderance of the evidence what amount do you find that defendant Bryant represented to be the value per acre of the royalty in question on June 4, 1948?"; answered, "$239.29 per acre." Under the statutory method of submission, we are not primarily concerned with *Bryant's* representation of value of the realty involved. Controlling as an issue is the *jury's* estimate of value, based on defendant's representations made with respect thereto, in kind, character, and condition.

█ The form of Issue 12 inquiring "the reasonable cash market value per acre" of the royalty on June 4, 1948, is objected to as not in conformity with the measure of damages fixed by the statute, which refers to difference in "value" as represented in contrast to "actual value" in the condition delivered. The word "value" usually signifies "market value," the terms being used interchangeably; also both are the equivalent of "actual value" and "saleable value". And in at least two of the cases involving aforesaid statutory damages, "market value" has been approved as in compliance therewith. See Speer v. Pool, Tex.Civ.App., 210 S.W.2d 423; Hughes v. Belman, Tex.Civ.App., 200 S. W.2d 431. Market value of an article is usually the best evidence as to its value; 17 Tex.Jur. p. 502; in absence of which, evidence of actual or intrinsic values may be received. Lone Star Gas Co. v. Holifield, Tex.Civ.App., 150 S.W.2d 282; and the legislative wording of art. 4004 was doubtless intended to cover both situations. Here the evidence tendered by plaintiff was of cash market value properly defined, and we find no objection to the form of issue thus framed, the property in question being susceptible of such a valuation.

Further discussion of points is deemed unnecessary in view of another trial. The judgment under review is reversed and cause remanded to the trial court.